777 So.2d 438 (2001)
Faith O. HORNING-KEATING, Petitioner,
v.
STATE of Florida, Respondent.
No. 5D00-1724.
District Court of Appeal of Florida, Fifth District.
February 9, 2001.
*440 James M. Russ of Law Offices of James M. Russ, P.A., Orlando, for Petitioner.
Robert A. Butterworth, Attorney General, Tallahassee, and Kellie A. Nielan, Assistant Attorney General, Daytona Beach, for Respondent.
PLEUS, J.
Ms. Keating seeks a writ of certiorari to the circuit court quashing portions of the trial judge's order which granted the state's motion to compel her to answer questions in a deposition. She refused to answer, claiming attorney work product protection, attorney client privilege, and Chapter 934 (Security of Communications Act). We grant certiorari and quash the portion of the order which granted the state's motion to compel.
This case began in 1994 as a workers' compensation benefits claim by Barney Dreggors and his wife, Kerry. Their claims compensation attorney is the petitioner, Ms. Horning-Keating. Suspecting fraud, the insurance carrier began an investigation and Kerry Dreggors ultimately was charged with one count of grand theft arising from the receipt of benefits.
Louise Rothstein, a state witness and one of Barney's care providers, testified at a hearing on an unrelated motion to suppress certain tape-recorded conversations that she had been informed a check for $51,000 had been made out to her for providing attendant care to Barney. She apparently claims she never provided the care which the check represented. In the hope of bolstering its case, the state deposed Ms. Keating.
At the deposition of Ms. Keating, the state asked certain questions which form the basis of the motion to compel.[1] Specifically, the opinion work product protection was asserted in response to various questions dealing with the workers' compensation case as follows:
Q. So in other words, he [Barnie] suffers an injury and would be entitled toarguably be entitled to a certain amount of money based on that injury and that additional funds from beyond that be it forand again, I'm being loose with my terms here because I don't know Work Comp vernacularbut additional funds for extended care or attendant care, to use a phrase that we'll get into, or that kind of thing? Is that basically how it works?
Keating then was asked whether the workers' compensation judge found that Barney had a "compensable head injury," which would entitle him to attendant care benefits:
Q. Okay. So would it be a fair statement then to say that the trial was about whether or not your client, Mr. Dreggors, was entitled to attendant care benefits? [P. 15, L. 14-17[2]]
*441 Keating next was asked about how workers' compensation cases generally work:
Q. Is that what's usually done, more generically speaking, in a case like this where there's some issue as to a Work Comp claim and an award is made in a spousal situation; is it considered the husband and wife are in effect that same person or are funds directed towards one or the other? [P. 16, L. 2-7]
When Keating again objected on the ground of work product, the attorney tried to restate the question:
Q. Well, I just meant generically, the usual course of conduct in the Work Comp arena? [P. 16, L. 10-11]
The attorney asked about what occurred after the workers' compensation case, and Keating replied that the insurance company had appealed the workers' compensation judge's ruling. The attorney then asked:
Q. Was theand I'm assuming it's like somewhat similar to a criminal case. They got a result they didn't like and they were in effect asking for some court to reconsider the initial holding? Is that basically what occurred? [P. 17, L. 19-23]
The attorney asked what happened in 1997 when the insurance company allegedly did not comply with the court's order on attendant care benefits. He queried:
Q. What was the insurance company's-again regarding attendant care benefits, what were they suppose to do?
. . .
Q. Well, I mean, was the understanding that they owed your client money for attendant care? [P. 19, L. 6-12]
Next, specifically, the work product protection was asserted in response to questions dealing with Louise Rothstein, as follows:
Q. Were you ever aware of an encounter, and this would have been a few days before the meeting if that in fact happened as between or among Mr. and Mrs. Dreggors and Louise Rothstein at Louise Rothstein's house? [P. 24, L. 21-25]
Q. Did you ever instruct your clients, Mr. and Mrs. Dreggors, to go to Louise Rothstein's home? [P. 25, L. 5-6]
Q. Was there an award mademaybe award is not the right word. Was the insurance company ordered to make a payment to your clients, Barney and/or Kerry Dreggors, as a result of attendant care that was provided by anyone? [P. 26, L. 21-25]
Keating did state, however, in response to questions, that she received a $51,900 check from the insurance company to Louise Rothstein for Dreggors' attendant care. The state attorney asked:
Q. Why was the insurance company sending Ms. Rothstein a check in that amount of money? [P. 30, L. 25-P. 31, L. 1]
Keating said the check was never cashed, and she mailed the check back to Mr. Spangler at the insurance company. The state attorney questioned:
Q. When you mailed the first check back to Mr. Spangler, did you provide him with any reason why you were doing it? ...
Keating admitted she received a second check from the insurance company, so the attorney queried:
Q. Do you know why he sent you a second check in July of '97? [P. 32, L. 7-16]
Apparently the insurance company sent a check to Louise Rothstein because the attorney then asked:
Q. Do you know why then the insurance company sent her [Louise Rothstein] a check? [P. 34, L. 7-8]
Q. Do you know, and again I've asked this already, I don't mean to repeat. *442 Do you know if the whereabouts do you know whatever happened to the second check?
* * * *
Q. Do you know the basis upon which that second check was issued? ...
Q. If Louise Rothstein had provided any sort of care for Mr. Dreggors, would she have been entitled to be compensated for that care? [P. 34, L. 15-P. 35, L. 2]
The last question of the deposition, which Keating points to as support for her claim of opinion work product protection, was Keating being asked in a line of questions whether she was aware that she was listed as a witness by defendant Kerry Dreggors. She was asked:
Q. Do you know or have an opinion as to why he did that? [P. 36, L. 7-8]
Keating points to the questions as examples of opinion work product protection.
Keating next argues that the following questions are fact work product queries:
Q. And when did you first hear of Ms. Rothstein? ...
Q. Well, let me ask you this. Did you hear of Ms. Rothstein through your clients? ...
Q. Okay. But you have heard the name Louise Rothstein?
Q. Do you know if Louise Rothstein had any kind of a relationship with your client Ms. Dreggors? ...
Q. How many times did you have direct contact, either by telephone conversation or face to face meeting, with Ms. Rothstein? ...
Q. Was there ever a time, and forgive me I've asked this already, but was there ever a time that you met Louise Rothstein face to face?...
Q. Was there an incident on April 18, 1997, where a meeting occurred in your office between Ms.well, I should say among you and Ms. Rothstein and Mr. and Mrs. Dreggors? ...
Q. Did Louise Rothstein ever make any statements to you about her relationship with Mr. and Mrs. Dreggors? ...
Q. Did she ever make any statements directly to you that she had any particular concerns relating to this Worker' Compensation case?
Q. Do you have any knowledge as to whether or not Louise Rothstein provided any sort of care or supervision for Barney Dreggors?
Q. When did you receive the first check? ...
Q. So I guess you can't tell me when you received the second check?
Q. Did Louise Rothstein ever have possession of that check? ...
Q. Do you know if Ms. Rothstein knew about that check? ...
Q. Did you provide that check to Ms. Rothstein?
Q. Did you at any time ask that Ms. Rothstein's name be removed from the check? ...
Q. Do you know if your client Kerry Dreggors ever paid Louise Rothstein to provide any sort of care or watch over her husband in any way?...
Q. Do you know what the living arrangements were as betweenwell, do you know where Ms. Rothstein lived say between late September of '94 and through '95?
The trial judge, however, did sustain an objection on the basis of work product to the following questions which are not an issue in this case:
The attorney asked what it meant when the workers' compensation judge found that there was a "compensable head injury:"
1. And what did that mean? (P. 14, L.22)

*443 2. Well, as a result of that holding, what did that mean for your client, Ms. Dreggors? [P. 14, L. 25-P. 15, L. 1]
When the attorney asked about Keating's dealings with Louise Rothstein, he asked:
3. Did you yourself even form an opinion as to-if you'd met her-form an opinion as to Ms. Rothstein in terms of her credibility? [P. 25, L. 10-12]
The attorney asked several questions about the $51,000 check sent from the insurance company to Louise Rothstein for Dreggors' attendant care:
4. And why did you send the check back to Mr. Spangler? [P. 31, L. 11-12]
5. Why did you send the check back to him? [P. 32, L. 12]
6. Was Ms. Rothstein entitled to the amount of money reflected on that check? [P. 33, L. 25-P. 34, L. 1]
7. The dollar amount of the check that we discussed, $51,000.00, do you know the basis for that amount? In other words, why was it that amount as compared to some other amount? [P. 35, L. 18-21]
On May 18, 2000, a hearing was held on the state's motion to compel Ms. Keating to answer the deposition questions. On the same day, the court held a hearing on Kerry Dreggors' motion to suppress and to exclude certain tape recordings. The first motion heard that day was the motion to compel, which was attended by Ms. Keating's counsel, James Russ. No live testimony was taken on the motion to compel. At the conclusion of the motion to compel, the judge took the matter under advisement, and Ms. Keating's counsel, Mr. Russ, left the courtroom. The trial judge then heard argument on Kerry Dreggors' motions to suppress and exclude certain taped conversation between Rothstein and the Dreggors. It was at that later evidentiary hearing on the motion to suppress and exclude tape recordings that live testimony was taken from Ms. Rothstein.

Work Product Protection
Ms. Keating, as an objection, asserted work product protection. The numerous questions asked at her deposition, as set forth above, cover two general categories of work: opinion work product and fact work product.
More than fifty years ago, the United State Supreme Court, in Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), held that oral statements made by witnesses to an attorney in the course of the litigation process are absolutely privileged and nondisclosable under what has come to be known as work product protection. The court wrote in that case:
But as to oral statements made by witnesses to ... [the attorney], whether presently in the form of his mental impressions or memoranda, we do not believe that any showing of necessity can be made under the circumstances of this case so as to justify production. Under ordinary conditions, forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness. No legitimate purpose is served by such production. The practice forces the attorney to testify as to what he remembers or what he saw fit to write down regarding witnesses' remarks. Such testimony could not qualify as evidence; and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and much more an ordinary witness. The standards of the profession would thereby suffer.
Id. at 512-513, 67 S.Ct. 385 (emphasis added.)
As for oral statements taken by attorneys from witnesses, Florida courts have repeatedly and consistently held that the contents of these interviews are nondisclosable work product. See Eagan v. DeManio, *444 294 So.2d 639 (Fla.1974) (investigative interviews of witnesses by state prosecutors are work product); Olson v. State, 705 So.2d 687, 690 (Fla. 5th DCA 1998) ("[t]he oral and unrecorded statements of witnesses to a state attorney are privileged as work product and not subject to discovery"); State v. Rabin, 495 So.2d 257, 260-61 (Fla. 3d DCA 1986) (oral statements in a pretrial interview between criminal defendant's former spouse and his defense counsel "constituted protected work product").
Opinion work product involves a lawyer's impressions, conclusions, opinion and theories of her client's case. Opinion work product is an absolute, or nearly absolute, privilege. Rabin. Fact work product concerns what the attorney did and what she learned in her role as attorney. As the name suggests, fact work product is factual information which pertains to this client's case prepared or gathered in connection therewith. Id., 495 So.2d at 262.
The fact work product is discoverable only if the parties seeking this work product show the court: (1) the need for this fact work product to prepare a party's case; and (2) that, without undue hardship, the party is unable to obtain the substantial equivalent of this fact work product by other means. Thus, "need" and "hardship" elements must be alleged in the motion to compel and established to the court's satisfaction at an adversarial hearing.
This need and hardship must be alleged in the motion to compel. State Farm Mutual Automobile Ins. Co. v. LaForet, 591 So.2d 1143, 1144 (Fla. 4th DCA 1992). Because respondents' motion below contains no claim that the factual information in the memorandum is needed for the forthcoming evidentiary hearing or that the information cannot be obtained from any other source without undue hardship, the motion was facially insufficient to compel production and should have been summarily denied. Id. at 1144....
Whealton v. Marshall, 631 So.2d 323, 325 (Fla. 4th DCA 1994).
The motion to compel and the transcript of the hearing on the motion show a total failure to meet this requirementthe "need" and "hardship" allegation. The contents of the state's motion to compel refer to the witness Rothstein and asks the court to take judicial notice of the charging affidavit filed in the captioned case by the state. This affidavit states that witness Rothstein, the Wausau Insurance Company, the police agents and the attorneys for the state of Florida have been cooperating and working together since at least April 10, 1997. The state, in the past, and now, has much better access to Ms. Rothstein and her claimed knowledge of the fraud allegations.
The history of the workers' compensation claim litigation is readily available from the judicial records of the workers' compensation case. The state has no unfulfilled "need" because the information it seeks through the deposition of Ms. Keating is already possessed by it or is otherwise readily available to it. The state has no "hardship" because it has a much greater ability to investigate and obtain information.
The following Florida cases support our rationale: Prudential Ins. Co. of America v. Florida Dept. of Ins., 694 So.2d 772 (Fla. 2d DCA 1997) (bare assertions of need and undue hardship are insufficient to require the production of work product); Intercontinental Properties, Inc. v. Samy, 685 So.2d 1035 (Fla. 3d DCA 1997) (party seeking discovery had ability to obtain information sought through other channels); North Broward Hosp. Dist. v. Button, 592 So.2d 367 (Fla. 4th DCA 1992) (a showing of need and undue hardship must include specific explanations and reasons; unsworn assertions of counsel are insufficient); Dade County School Bd. v. Soler By and Through Soler, 534 So.2d 884 (Fla. 3d DCA 1988) (the burden is on party *445 seeking discovery to demonstrate need and undue hardship).
To compel an attorney to divulge her fact work product absent both allegations and proof of need and hardship would put the diligent attorney in the position of working on behalf of her opponent. It would seriously damage or destroy a relationship of trust, confidence, and respect between the attorney and her clients. There would be no reason for the legal profession to exist as an integral arm of the American justice system. See In re Grand Jury Investigation, 412 F.Supp. 943 (E.D.Pa.1976). This rationale is clearly and concisely stated by Mr. Justice Jackson in his concurring opinion in the landmark case of Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947):
The primary effect of the practice advocated here [compelling an attorney to reveal information relating to her representation of a client] would be on the legal profession itself. But it too often is overlooked that the lawyer and the law office are indispensable parts of our administration of justice. Law-abiding people can go nowhere else to learn the ever changing and constantly multiplying rules by which they must behave and to obtain redress for their wrongs. The welfare and tone of the legal profession is therefore of prime consequence to society, which would feel the consequences of such a practice as petitioner urges secondarily but certainly.
See also In re Terkeltoub, 256 F.Supp. 683 (S.D.N.Y.1966).

Attorney-Client Privilege
The oldest and most revered principles of Anglo American law is the attorney-client privilege and the sacred duty of a lawyer to not reveal the secrets and communications of a client. Upon admission to the Bar, a lawyer does not give a mere promise, but a solemn oath to "maintain the confidence and preserve inviolable the secrets of the client ... So help me God."[3] The purpose of the privilege is to encourage broad communication between a lawyer and the client and thus promote the broader public interest in the proper administration of justice. See Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).
The Florida Legislature has codified the common law attorney-client privilege through the enactment of section 90.502, Florida Statutes (1997):
(2) A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client.
In its order, the trial court concluded that because the state presented prima facie evidence the Dreggors had sought the services of Ms. Keating to procure a fraud in the workers' compensation case, no attorney-client privilege existed. The crime/fraud exception to the attorney-client privilege is discussed by Professor Ehrhardt:

*446 Under section 90.502(4)(a), when a client retains a lawyer to aid in the commission of a crime or in the planning of future criminal activity, the privilege does not exist. The attorney-client privilege should not be used as a shield for the perpetration of criminal action. Similarly, if a client consults an attorney for advice which will aid in the perpetration of a fraud or help the client in planning a fraud, the privilege does not exist.
(footnotes omitted). CHARLES W. EHRHARDT, FLORIDA EVIDENCE § 502.7 (2000). In Jones v. General Motors Corp., 24 F.Supp.2d 1335, 1338-39 (M.D.Fla.1998), the court stated the following:
To come within the crime-fraud exception to the attorney-client privilege, plaintiffs "must allege and produce prima facie evidence that ... [the client] affirmatively sought the advice of counsel to procure a fraud" ... The [evidence presented] does not satisfy the plaintiffs'"burden of showing probable cause that a fraud was perpetrated or planned and that the attorney-client communications were in furtherance of the fraud...."
(applying Florida law) (citations omitted).
The court's order on the state's motion to compel was entered June 13, 2000, and it states that at the hearing on May 18, the court heard testimony of witnesses. This is factually misleading because of the two separate hearings. The order further reflects that the state presented the "affidavit" and "live testimony of Louise Rothstein" and that, based on her testimony, the state "has presented prima facie evidence that Defendant sought the services of Ms. Keating to procure a fraud in the workers' compensation case." Based on the supposed prima facie evidence of procuring fraud, the court concluded the attorney-client privilege did not apply. In actual fact, no evidentiary hearing was held in connection with the motion to compel. The so-called "affidavit" referred to in the order was actually an unsworn statement of Ms. Rothstein which would not qualify as evidence in any event.
Because we grant certiorari and quash the order based on the work product objection we believe it unnecessary to rule on the objection made on the basis of the attorney-client privilege. However, we feel compelled to note should the issue again arise in a subsequent deposition, it would be a denial of due process, in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article 1, Section 9 of the Florida Constitution, to base an order to compel testimony on an unsworn statement or on testimony taken outside the hearing on the motion to compel. The court should have held a full evidentiary hearing just as it did on Kerry Dreggors' two motions.
One might argue that if a denial of due process occurred, it harmed only Kerry Dreggors who is not asking for the writ of certiorari. That argument ignores the unity of the relationship of attorney to client, the sanctity of the attorney-client privilege, and the fact that the attorney asserts the privilege on behalf of the client. If you cannot compel a defendant to be a witness under the Fifth Amendment, then most certainly you should not be able to substitute the defendant's attorney and force incriminating testimony.
Assuming arguendo that the state established a prima facie showing that Kerry Dreggors was involved in fraud, that fact alone does not establish she was seeking Ms. Keating's advice to commit the fraud. The workers' compensation claim had been pending and was ongoing so presumably the contacts between the Dreggors and Ms. Keating related only to that issue and not to fraud. It must be established that the attorney-client communications were in furtherance of the fraud.
The trial court's conclusion was based on what the court considered as "prima facie evidence" that Kerry sought the service of Ms. Keating to procure a *447 fraud in a workers' compensation case. The record does not support the conclusion because the "evidence" considered was not appropriate, if evidence at all. The state presented no live testimony on the issues involved in the motion to compel. Indeed, the court relied on an unsworn statement and Rothstein's testimony in an unrelated hearing. No adversarial evidentiary hearing was held so that Ms. Rothstein could be cross-examined.
There is a vague assertion in the record that the attorney-client privilege was waived by the presence of a third party. However, the record is not clear that Ms. Rothstein was even present when a confidential conversation occurred. The only evidence is that she was present in the office of Ms. Keating. Perhaps it could have been established at the hearing on the motion to compel whether the attorney-client privilege was waived by the presence of a third party. Unfortunately, the record does not enlighten us. See Mobley v. State, 409 So.2d 1031 (Fla.1982); Olds v. State, 302 So.2d 787 (Fla. 4th DCA 1974), cert. denied, 312 So.2d 743 (Fla. 1975).
We believe that should this matter arise again, the court should hold an adversarial hearing where the state, as the party seeking to invoke the crime-fraud exception, would present sufficient admissible evidence to support a reasonable belief that a crime fraud exception applies. Ms. Keating's attorney should have the right to be present and cross-examine or present evidence of her own. See, e.g., Jones, 24 F.Supp.2d at 1339. Such a hearing would also clarify the related issue of whether the presence of a third party waived the privilege.

Security of Communications Act
While it is equally unnecessary to address the issues raised regarding the Security of Communications Act, we feel compelled to comment on the state's use of tape-recorded conversation which has been obtained in violation of section 934.06, Florida Statutes (1997). According to unsworn testimony from Ms. Rothstein, which the state claims it used in support of its motion, Ms. Rothstein, at the suggestion of the attorney for the Wausau Insurance Company, secretly tape-recorded conversations she personally had with Barney and Kerry Dreggors. She also secretly taped conversations she had in Ms. Keating's office. The tapes were then taken to the state police officer, David Locker.
At the hearing on a motion to suppress the tapes, the state admitted the tapes should be suppressed. Section 934.06 prohibits the use of evidence obtained as a result of intercepted communications. The trial court orally granted the motion. At that point one could argue that any issue as to the use of tapes is moot. However, the state should not be using the tapes to formulate questions which were asked of Ms. Keating at her deposition. The state further should not disclose the contents of any and all communications which were intercepted.
The privacy of the conversations in Ms. Keating's law office on April 18, 1997, from unconsented interception and recording, is legally protected by the Fourth and Fourteenth Amendments to the United States Constitution by Article I, Sections 12 and 23 of the Florida Constitution, and by sections 934.03 and 934.06, Florida Statutes (1997). In determining the scope of these legal protections, a two-part test has been judicially formulated: (1) the person must have a subjective expectation of privacy; and (2) that expectation must be one that society recognizes as reasonable. See Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); State v. Smith, 641 So.2d 849, 851 (Fla.1994); Mozo v. State, 632 So.2d 623, 628 (Fla. 4th DCA 1994), approved, 655 So.2d 1115 (Fla.1995).
Applying this two-part test to the facts in this case-secret and unconsented interception and recordings by a witness of conversations/interviews with an attorney and her clients in the attorney's law office-leads *448 inescapably to the conclusion that this conduct violates Ms. Keating's protected privacy rights and the provisions of Chapter 934 of the Florida Statutes (1997). The privacy of a public telephone booth is recognized in Katz. The privacy of cordless telephone conversations is recognized in the two Mozo decisions. The privacy of a dressing room in a commercial business is recognized in LaPorte v. State, 512 So.2d 984 (Fla. 2d DCA 1987), rev. denied, 519 So.2d 987 (Fla.1988). In the context of Ms. Keating's deposition, the questions asked by prosecutor Finkbeiner and the compelled answers from Ms. Keating would constitute the "fruits of the poisonous tree"the fruits of the illegal conduct of Ms. Rothstein acting in conjunction with Wausau Insurance Company, the Florida state police agent Locker, and prosecutor Finkbeiner.
The petition for writ of certiorari is granted. Faith O. Horning-Keating shall not be compelled to answer any of the remaining questions posed to her by the state as set forth above, or any other questions which are contrary to the view expressed here.
PETITION GRANTED, ORDER AFFIRMED IN PART AND QUASHED IN ACCORDANCE WITH THIS OPINION.
SAWAYA, J., concurs in result only.
GRIFFIN, J., dissents, with opinion.
GRIFFIN, J., dissenting.
I respectfully dissent.
Of the three grounds in the majority opinion for reversing the trial court's order permitting discovery from attorney Horning-Keating, only one, work product immunity, in my view, is even arguable. Of most far-reaching concern is the majority's new "exclusionary rule," preventing discovery of what occurred during the conference based on the secret taping of the conference. The notion that the state is precluded, on a "fruit of the poisonous tree" theory, from conducting discovery concerning the meeting among Mr. Rothstein, Mr. and Mrs. Dreggors and Attorney Horning-Keating, has no legal support that I am aware of and none has been cited. The statute provides the remedies for violation of the statute and "immunity from discovery" is not among them. As for attorney/client privilege, the majority suggests it is unclear whether a third person (Ms. Rothstein) was present when the privileged communications occurred, but it is clear to me that Ms. Rothstein was present. Indeed, the focus of the discovery is the communication between Ms. Rothstein and Ms. Horning-Keating. Most telling, examination of the myriad of objections to discovery interposed by Ms. Horning Keating reveals that none include the contention that Ms. Rothstein was not present.
Finally, the trial court found that there was a prima facie showing below that the crime/fraud exception would overcome either attorney/client privilege or work product immunity. The majority rejects this finding on two grounds. First, the affidavit of Ms. Rothstein is defective because the notary who witnessed Ms. Rothstein's affidavit did not select and mark the "did/did not take an oath" part of the form, thereby rendering the document an "unsworn" statement. Second, it is suggested that there was no proof of the elements needed to establish the "crime/ fraud" exception. As for the affidavit, it sets forth at the outset that Ms. Rothstein "has been duly sworn" and "deposes" and her signature is notarized. Further, Ms. Rothstein repeated the statements in open court, before the judge. This is sufficient for purposes of the prima facie showing requirement of the crime/fraud exception. The Rothstein affidavit set forth at length that her relationship with the Dreggors was as tenant, not caregiver. She paid the Dreggors rent to live with them and she never had any responsibility to provide Mr. Dreggors any care. Indeed, she said that, based on her observation of him, he didn't require any care. She then explained *449 the circumstances of the meeting that is the subject of the discovery dispute:
20. On April 14, 1997, Kerry and Barney Dreggors came unannounced to my place of employment and requested that I have lunch with them to further discuss the insurance money. However, I was unable to leave work for lunch and the Dreggors talked to me briefly in the hallway. The Dreggors informed me that their attorney, Faith Keating, had a check from the insurance company with my name as co-payee along with the name of Faith Keating. Kerry and Barney Dreggors requested that I go to Ms. Keating's office and endorse the check.
21. On April 15, 1997, at approximately 9:00 a.m., I met with Kerry and Barney Dreggors at my house. At this meeting, Kerry and Barney Dreggors, showed me a copy of the $51,979.05 check made payable to Faith Keating and myself, Louise Rothstein, from the workers' compensation insurance company. Kerry Dreggors and Barney Dreggors attempted to convince me to endorse the check from the insurance company, even after I told them I had not provided attendant care. I told Kerry and Barney Dreggors that I would not endorse the check since the check (Wausau check # 26040676) stated that the payment was for "Attendant Care for Barney Dreggors from 9-1-94 thru 9-17-95." I told Kerry and Barney Dreggors that I believed this would be insurance fraud.
22. On April 18, 1997, at 10:30 a.m., I met with Kerry Dreggors, Barney Dreggors, and attorney Faith Horning-Keating at the office of Ms. Keating, 3203 Lawton Road, Suite 120, Orlando, Florida. At this meeting, I repeatedly told Ms. Keating that no one had ever requested that I provide attendant care to Barney Dreggors. I repeatedly told Ms. Keating that I had not provided attendant care or monitoring services to Barney Dreggors. Notwithstanding my statement of refusal, Ms. Keating attempted to convince me that I had in fact provided attendant care services. I also explained to Ms. Keating that I never had an agreement with Kerry Dreggors to exchange attendant care services for rent. I explained that I had always paid rent. Ms. Keating said that this fact was of no consequence because the Judge had already ordered the insurance company to pay.
Clearly, the attorney/client privilege is not a bar to discovery in this case, and to the extent that the work product immunity may be (i.e. that Ms. Horning-Keating was interviewing a potential witness for ongoing litigation), the crime/fraud exception was established to obviate any work product immunity.
I would deny the writ.
NOTES
[1] Many of the questions were answered by Ms. Keating and are not involved in this appeal.
[2] References to the page and line numbers of the deposition are included in this opinion so that on remand there will be no confusion as to the questions covered by this opinion.
[3] The Rules Regulating The Florida Bar, Chapter 4. Rules of Professional Conduct, make clear the professional responsibilities of an attorney to her client. Rule 4-1.6. states, "A lawyer shall not reveal information relating to representation of a client ... unless the client consents after disclosure to the client." The Comment to Rule 4-1.6. also states:

The observance of the ethical obligation of a lawyer to hold inviolate confidential information of the client ... encourages people to seek early legal assistance....
A fundamental principle in the client-lawyer relationship is that the lawyer maintain confidentiality of information relating to the representation....
... The attorney-client privilege applies in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client.... The confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source. A lawyer may not disclose such information....