ROTHENBERG, J.
(dissenting).
Bruce B. Brugmann (“Brugmann”), founder, editor, and publisher of the San Francisco Bay Guardian, filed the instant petition seeking review of the trial court’s order: (1) granting The State of Florida’s (“the State”) motion to seal and to prohibit anyone from disclosing or using the contents of tape recorded conversations between (a) Sean Casey (“Casey”), Casey’s mother, and Casey’s attorney, Milton Hirsch and (b) Casey, Casey’s mother, and Michael Rappaport, a psychologist to whom Hirsch referred Casey for counseling during the pendency of his criminal case; and (2) sealing the following court records: (a) Casey’s motion seeking relief of judgment, (b) Casey’s addendum and appendices to the motion seeking relief of judgment, (c) the special appearance of counsel representing Casey for the purpose of opposing the State’s motion to seal, (d) the memorandum of law submitted by Casey’s counsel, and (e) Casey’s supplemental motion filed in opposition to the State’s motion to seal.
As will be explained in this dissent, the trial court erred in sealing these records and the rulings of the trial court and this Court are in direct conflict with Florida law. If these errors are not ultimately corrected, Dr. Rappaport will be shielded from possible criminal prosecution and/or review by the Florida Department of Health; Hirsch will be shielded from meaningful review by The Florida Bar; and the public will be denied access to important judicial documents. See Notice of the Florida Department of Health’s Interest in the Sealed Recordings filed in this Court on November 4, 2010 (stating that the sealed records are necessary to investigate whether Dr. Rappaport committed professional misconduct); Notice of The Florida Bar’s Interest in the Sealed Recordings (explaining that without access to the sealed recordings, it is Casey’s word against Hirsch’s word, which The Florida Bar found was insufficient proof).

PROCEDURAL HISTORY

In March 2001, Casey was arrested and charged with DUI manslaughter, vehicular homicide, and leaving the scene of an accident involving death. Soon thereafter, Casey hired Hirsch to represent him, and Hirsch referred Casey to Rappaport, a psychologist, for counseling. Rappaport counseled Casey every week for approximately one year at $175 a week, until Casey discontinued the visits after concluding that the sessions were costly and unproductive. On September 20, 2004, just prior to the scheduled trial date, Casey fled the country.
In 2006, Casey was detained in Chile on a visa violation, after which he voluntarily returned to the United States to face the 2001 criminal charges. On the day of trial, Casey entered into a negotiated plea with the State wherein he pled guilty to the charges, including the added fleeing charge, and received a sentence of twelve years and six months in state prison. Approximately two weeks later, Casey, through newly retained counsel David *41 Scott Markus,[1] filed a motion to vacate his plea alleging that Hirsch and Rappaport had (a) advised Casey to flee the country prior to trial; and (b) encouraged him to take a plea to prevent Casey from explaining why he had fled the country. Casey claimed that, based on this clear conflict, he was denied effective assistance of counsel and therefore should be permitted to withdraw his plea.
On January 8, 2007, the trial court conducted an evidentiary hearing. At the hearing, Casey and his mother both testified that Hirsch and Rappaport had advised Casey to flee the country, whereas Hirsch and Rappaport, who were also under oath, denied advising Casey to flee. Additionally, Casey testified that on the day of the scheduled trial, when the trial court ruled that the State would be permitted to offer evidence of Casey’s flight as consciousness of guilt, Hirsch realized that Casey would testify as to why he had fled, and thereafter, Hirsch coerced Casey into accepting the State’s plea offer, rather than standing trial. A summary of the testimony follows.

Sean Casey

Casey testified that he hired Hirsch after he was arrested and that he never intended to flee because he wanted to stay and “fight the case.” When he hired Hirsch, Hirsch advised Casey to see Rap-paport on a weekly basis, which he did for approximately one year.
In November of 2003, Casey received a letter from Hirsch asking Casey to come to his office. Casey testified that at this meeting Hirsch told him that if he could, he would make Casey disappear, specifically stating: “If I were you, I would just disappear.” Hirsch then asked Casey to meet with Rappaport one more time. When Casey left Hirsch’s office, Casey broke down crying because he believed his attorney had given up on him because he was advising him to flee.
Casey was reluctant to see Rappaport. He had already spent a substantial amount of money on his defense ($65,000 to Hirsch, plus litigation costs; and $175 weekly for approximately one year for his sessions with Rappaport). However, Casey recalled that, on a previous occasion when he failed to follow Hirsch’s advice, he received a letter from Michael Haber, Hirsch’s associate, telling him that he needed to listen to Hirsch. Therefore, when he received a letter from Hirsch in December 2003 or January 2004 asking him to see Rappaport, once again Casey agreed to go. At this meeting, Casey claims Rappaport told him that he was aware that Casey had met with Hirsch, and Rappaport assured Casey that being a fugitive would not be difficult. Rappaport told Casey that he could obtain a fake identification and have plastic surgery, and advised Casey to keep a low profile. After these meetings, whenever Casey appeared for a court hearing, Hirsch would make comments to Casey such as: “Oh, you’re still here? I heard property is cheap in Argentina these days.... [Wjhat’s the weather down there in South America?”
Casey testified that, because both his attorney and his therapist were telling him that he needed to flee, he decided to follow their advice. When Casey told his mother that Hirsch and Rappaport were advising him to flee the country, she asked to meet with them. On May 12, 2004, Casey and his mother met with Hirsch; and on May 13, 2004, they met with Rappaport. These *42 meetings were secretly recorded by Casey and/or his mother.
Casey testified that, although at the recorded May 12, 2004, meeting Hirsch again spoke to Casey about disappearing, Hirsch did not do so as directly as he had during the November 2003, meeting. At this May 12, 2004, meeting, Hirsch told Casey that he wished Casey would just disappear, stating that if Hirsch had a magic wand, he would make Casey disappear. Casey testified that he eventually took the advice of his lawyer and therapist and fled to Chile.
Approximately two years later, when Casey was apprehended in Chile, he contacted Hirsch and Casey was eventually deported to Miami. The day after Casey returned to the United States, Hirsch, Rappaport, and Michael Haber came to see Casey at the jail. Casey testified that the first thing Rappaport asked him was why he had not changed his name. Casey testified that they told him “not to say anything — to keep his mouth shut,” so he took the plea offered by the State, and during the plea hearing, he answered “yes” and “no” to the trial court’s questions, as Hirsch and Michael Haber advised him to do. The following day he contacted another lawyer, David Scott Markus, to represent him. Casey testified that he would not have left the country but for his lawyer’s advice.
During cross-examination, the prosecutor, who had the tapes in her possession and had listened to them just prior to the hearing, suggested to Casey, who had not listened to the tapes since 2004, that Hirsch had told Casey that “he [Hirsch] wanted the charges to disappear, not for [Casey] to disappear.” Casey, however, disputed the prosecutor’s representation, and Casey testified that: (1) both Hirsch and Rappaport had advised him to flee; (2) Rappaport had given him tips on how to successfully flee without getting caught; (8) Rappaport had told Casey about another client of his who was also a fugitive; and (4) Rappaport had told Casey that he could eventually return to Miami as long as he did not try to enter the country through Miami.

Casey’s mother

Casey’s mother testified that she came to Miami to meet with Hirsch because her son told her that his attorney was advising him to flee the country and Casey wanted her to hear what Hirsch had to say. When she met with Hirsch, Hirsch told her that he wished he could put Casey on another planet and make him disappear. Hirsch also advised her that her son had no chance of an acquittal and, if convicted, Casey was going away for a long time and it would be very difficult for someone like Casey to do the time. Casey’s mother also testified regarding the meeting with Rap-paport the following day, stating that Rap-paport advised Casey to flee and told him to listen to his attorney.
Casey’s mother testified that after her son fled, she received a call from the bail bondsman. When she called Hirsch, he told her to pay the $5,000 bond; not to worry because no one was looking for her son; he would call the bondsman; and “Sean would be fine.” After Casey was arrested in Chile on an international arrest warrant, Casey’s mother testified that she spoke to Hirsch again, and the first thing Hirsch said to her was, “[W]hy didn’t Sean change his name?”
On cross-examination, the prosecutor, as she did during her cross-examination of Casey, specifically referred to the contents of the secretly recorded tapes.
Prosecutor: And you know that the tape shows that at no time did Mr. Hirsch say anything about I wish I can make Sean disappear; isn’t that correct?
*43 Casey’s mother: That’s what I heard him say.
Prosecutor: He wanted this [the case] to disappear for Sean because he felt sorry for Sean, not for Sean to disappear?
Casey’s mother: No. That’s not what I heard him say. I heard him say I wish I could put Sean in [sic] another planet somewhere and make him disappear. Prosecutor: This [the case] to disappear.
Casey’s mother: No. Make Sean disap-pearj[2]

Milton Hirsch

Hirsch denied advising Casey, or any other defendant in his career, to flee the jurisdiction of the court. Hirsch also testified that he had reviewed the tape of his meeting with Casey and Casey’s mother that morning and what he had told Casey’s mother was:
Hirsch: I know how you feel. I’m a parent too. I know how much Sean means to you. I would give anything if I could just make this case against Sean disappear, but I can’t.
Prosecutor: And those were your words to her?
Hirsch: Yes.[3]
When Hirsch was asked what he thought when Casey did not appear for court, he responded that he “was fearful he put himself in harm’s way, gotten drunk, beat up and could have been dead or severely injured.” Despite this representation to the trial court, Hirsch admitted that he made no attempt to find Casey when he failed to appear in court, and that when he spoke to Casey’s mother after Casey fled, he never asked her whether Casey had been injured. He simply told her to pay the bondsman and “Sean would be fine.”
Upon Casey’s return to the United States, Hirsch confirmed that he, Michael Haber, and Rappaport met with Casey at the jail. However, he denied advising Casey to flee or, after Casey was caught, asking him why he had not changed his name. When asked why he sent Casey to Rappaport, he stated that Casey was difficult to deal with, he needed “Rappaport’s help in dealing with Mr. Casey,” and Rap-paport served as both Casey’s psychologist and as a “buffer.”

Michael Haber

Michael Haber testified that Hirsch asked for his assistance with Casey. Michael Haber admitted that he told Casey to listen to Hirsch and to follow his advice.

Dr. Rappaport

Rappaport testified that Hirsch referred some of his clients to him; Dr. Merry Haber is his partner; Dr. Haber’s son, Michael Haber, worked with Hirsch; and Michael Haber also referred some of his clients to him. He testified that Casey had no mental health issues, and that he was just helping Casey deal with his stressful situation. Although Rappaport admitted that he had several discussions with Casey about fleeing the country, he claimed these discussions were initiated by Casey, and he denied ever advising Casey to flee. Rappaport testified that he merely “listened” to Casey and “let him vent.”
After Hirsch and Rappaport testified, Casey sought to introduce two audio tapes to directly impeach their testimony, corroborate his testimony and his mother’s *44 testimony, and support the allegations made in his motion. One tape is a recording of the meeting Casey and his mother had with Hirsch in Hirsch’s office on May 12, 2004, and the other is a recording of the meeting Casey and his mother had the following day with Rappaport in Rappa-port’s office. These recordings were made without Hirsch’s and Rappaport’s knowledge or consent. Casey claimed that Hirsch and Rappaport lied when they testified that they had never advised him to flee, and that Hirsch lied when he testified that he told Casey he wished he could wave a magic wand and make Casey’s case disappear because what Hirsch actually stated was that he wished he could wave his magic wand and make Casey disappear.
The prosecutor, Hirsch, and Rappaport all admitted to listening to thé tapes just prior to the hearing. Specifically, when Mr. Markus learned about the existence of the tapes, he notified Hirsch as a professional courtesy. Hirsch then notified the prosecutor, and the prosecutor subpoenaed the tapes. At the time of the hearing, the tapes remained in the State’s possession, and although Casey and his mother were not given an opportunity to hear the tapes, Hirsch and Rappaport testified they had listened to them that morning.
The State objected to Mr. Markus’s use of the tapes at the hearing to impeach Hirsch and Rappaport, arguing that the tapes were inadmissible because the conversations were recorded without the consent of all of the parties, in violation of section 934.03, Florida Statutes (2004). The trial court found that, short of aiding and abetting in some criminal or “nepharious [sic] deed,” Hirsch (and apparently Rappaport) had a reasonable expectation of privacy. Based on the State’s representations, the trial court refused to listen to the tapes or review the transcripts to determine whether Hirsch or Rappaport did attempt to aid or abet Casey in a criminal act, denied Casey’s request to use the tapes at the hearing, and entered an order on March 7, 2007, denying Casey’s motion to vacate his plea. In its order, the trial court specifically noted that its ruling was based on its credibility determinations of the witnesses’ testimony and on its finding that the testimony of Casey and his mother was unworthy of belief. Thus, without listening to either tape or reading the prepared transcripts, the trial court determined that they were inadmissible under section 934.06; excluded their use both as substantive evidence and for impeachment purposes; and found that Casey’s and his mother’s testimony was not credible.
The trial court’s ruling on the admissibility of the tapes (either as substantive evidence or for impeachment purposes), without listening to the tapes or reviewing the prepared transcripts of the tapes, was error, and the ruling denied Casey his basic and fundamental constitutional due process right to defend himself. See Chambers v. Mississippi, 410 U.S. 284, 294, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (concluding that the exclusion of critical evidence, coupled with the State’s refusal to permit the accused to cross-examine a witness who had confessed to the same crime and then renounced his confession, denied the accused “a trial in accord with traditional and fundamental standards of due process,” and noted that “[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State’s accusations”); Alexander v. State, 931 So.2d 946, 950 (Fla. 4th DCA 2006) (holding that “[a] defendant’s fundamental right to defend himself or herself under the Sixth Amendment is denied when exculpatory evidence is excluded”); Jenkins v. State, 872 So.2d 388, 389 (Fla. 4th DCA 2004) (“There are few rights more funda *45 mental than the right of an accused to present witnesses in his or her own defense.”).
Casey appealed the denial of his motion to vacate his plea. On appeal, the tapes were not provided to this Court, and this Court, without the benefit of the tapes, affirmed the trial court’s order without issuing a written opinion. Casey v. State, 8 So.3d 1144 (Fla. 3d DCA 2009). Following Casey’s unsuccessful appeal of the denial of his motion to vacate his plea, he filed a pro se Motion for Relief of Judgment Because of Fraud Upon the Court.
In this motion, Casey alleged that Hirseh, Rappaport, and the State had committed fraud on the court by knowingly presenting false testimony at the eviden-tiary hearing. He alleged that since Hirseh, Rappaport, and the prosecutor had listened to the tapes prior to the hearing, they knew that the testimony given by Hirseh and Rappaport was false and the prosecutor had knowingly elicited this false testimony, thereby misleading the trial court. In support of his motion, Casey submitted transcripts of the tape recorded conversations he sought to introduce at the evidentiary hearing. Casey argued that because the trial court’s ruling on his motion to withdraw his plea was based on the trial court’s credibility assessment of the witnesses, and that since the recordings clearly demonstrated that Hirseh and Rap-paport had perjured themselves, Casey should be granted a new hearing and the trial court should reconsider its ruling.
In response, the State filed a motion to seal the tape recordings and transcripts. In opposition to the State’s motion to seal, Casey argued that no court had ruled that the conversations were illegally recorded, and taped conversations that record a criminal act are not protected under Chapters 934 or 777, Florida Statutes (2004). Casey argued that Chapter 934 only protects oral communications where there exists a justifiable expectation of privacy that society is willing to recognize as reasonable, but based on the contents of these recorded communications, no reasonable expectation of privacy could be demonstrated. Thus, the recorded communications were not protected under Chapter 934 and, consequently, they were admissible as substantive evidence. Additionally, Casey argued that because the tapes would reveal that Hirseh and Rappaport had lied under oath and provided perjured testimony at the hearing, the tapes were admissible for impeachment purposes. Lastly, Casey noted that the exclusion of this evidence resulted in the trial court’s reliance on perjured testimony, and adversely affected the trial court’s credibility determinations, thereby committing a fraud on the trial court.
On August 11, 2009, Bruce B. Brugmann, the founder and editor of the San Francisco Bay Guardian, filed a motion to intervene to oppose the State’s motion to seal. Brugmann argued that article I, section 24 of the Florida Constitution secures to all members of the public a right of access to all judicial records other than those that are permitted to be sealed by the Constitution, and that because the State did not establish that the tapes should be constitutionally sealed, the State’s motion to seal should be denied. Brugmann further argued that if the tapes support Casey’s assertions, they are not protected and must be made public.
These motions were heard by a successor judge. On August 18, 2009, the successor judge, without listening to the Rappaport tape, or considering the contents of the Hirseh tape in light of the statements made by Rappaport to Casey during their taped meeting, entered an order granting the State’s motion to seal and prohibited anyone from using or disclosing (1) the *46 contents of the recorded communications between Casey and Hirsch on May 12, 2004, and Casey and Rappaport on May 13, 2004; (2) the transcript of these tapes; (3) Casey’s motion seeking relief of judgment; (4) Casey’s addendum and appendices to that motion; (5) the special appearance of counsel representing Casey for the purpose of opposing the State’s motion to seal; and (6) Casey’s supplemental motion filed in opposition to the State’s motion to seal. On August 18, 2009, the trial court also entered an order denying Casey’s pro se Motion for Relief of Judgment Because of Fraud Upon the Court.
On September 17, 2009, Brugmann filed the instant petition for review of the trial court’s order sealing the judicial record. On April 21, 2010, this Court issued an order denying the petition without a written opinion, and on May 6, 2010, Brug-mann filed a motion for rehearing, rehearing en banc, and for a written opinion. The motion for rehearing was granted, and on April 27, 2012, the panel issued a written opinion denying Brugmann’s petition for review of the order sealing the judicial records. Brugmann v. State, 37 Fla. L. Weekly D1041 (Fla. 3d DCA Apr. 27, 2012). Upon issuance of the written opinion, Brugmann filed a subsequent motion for rehearing en banc. After review of the motion, this Court again granted rehearing; withdrew the April 27, 2012, panel opinion; and a majority of the voting members of this Court denied Brugmann’s petition without prejudice to seek relief by other means. For the reasons expressed in this dissent, I submit the petition should have been granted.

CHAPTER 934, FLORIDA STATUTES

Florida’s wiretap law differs from the federal wiretap law and from the law in the vast majority of the other states. Unlike federal law, which permits interception of oral communications if one of the parties to the communication consents, Florida’s wiretap law limits the use of the contents of any intercepted oral communication in judicial and administrative proceedings unless all of the parties to the communication consented to the interception or the interception is authorized by law. § 934.03, Fla. Stat. (2004). Section 934.06, Florida Statutes (2004):
Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, if the disclosure of that information would be in violation of this chapter. ...
Section 934.09(10)(a), Florida Statutes (2004), additionally provides:
Any aggrieved person in any trial, hearing, or proceeding in or before any court ... may move to suppress the contents of any intercepted wire, oral, or electronic communication, or evidence derived therefrom, on the grounds that: 1. The communication was unlawfully intercepted[.]
Section 934.02(2), Florida Statutes (2004), defines the term “oral communication” as “any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation .... ” (emphasis added). Thus, by state statute, only oral communications uttered by persons exhibiting an expectation of privacy under circumstances justifying that expectation are protected under Chapter 934.
In State v. Inciarrano, 473 So.2d 1272 (Fla.1985), the Florida Supreme Court held that the definition of “oral communication” set forth in section 934.02(2) made it “clear that the legislature did not intend *47 that every oral communication be free from interception without the prior consent of all the parties to the communication,” and that “[t]he statute protects only those ‘oral communications’ uttered by a person exhibiting an expectation of privacy under circumstances reasonably justifying such an expectation.” Id. at 1275 (emphasis in original). The Court further explained:
This expectation of privacy does not contemplate merely a subjective expectation on the part of the person making the uttered oral communication but rather contemplates a reasonable expectation of privacy. A reasonable expectation of privacy under a given set of circumstances depends upon one’s actual subjective expectation of privacy as well as whether society is prepared to recognize this expectation as reasonable.
To prevail Inciarrano must not only have had a subjective expectation of privacy, but also his expectation under the circumstances must have been one that society is prepared to recognize as reasonable ....
Id. (emphasis in original) (citation omitted). Thus, the courts apply a two-part test in determining whether the intercepted oral communication is protected by Chapter 934.

Step One: Did the Non-Consenting Party Have a Subjective Expectation of Privacy?

Citizens generally have a significantly higher expectation of privacy in their own homes. See Adams v. State, 436 So.2d 1132, 1133 (Fla. 5th DCA 1983) (finding that citizens have a significantly lower legitimate expectation of privacy in a place of business open to the public than they do in their homes). The law also recognizes a distinction between interception of a wire or oral communication at the direction of law enforcement and those intercepted by private citizens not acting at the direction of law enforcement. Section 934.03(2)(c) grants law enforcement or a person acting under the direction of law enforcement the authority to intercept communications “when such person is a party to the communication or one of the parties to the communication has given prior consent to such interception and the purpose of the interception is to obtain evidence of a criminal act.”
In the instant case, the first recorded conversation took place in Hirsch’s office. Hirsch was Casey’s lawyer and Casey was an invitee because Hirsch specifically asked Casey to come to his office to meet with him. Because this communication took place in Hirsch’s place of business, his expectation of privacy was less than if the conversation had taken place in his home. Avrich v. State, 936 So.2d 739, 742 (Fla. 3d DCA 2006) (“Florida courts have consistently held that the constitutional protections of a reasonable expectation of privacy do not extend to an individual’s place of business.”) (citing Adams, 436 So.2d at 1132). Additionally, although there existed an attorney-client relationship between Hirsch and Casey, the privilege protects the client, not the lawyer. See State v. Rabin, 495 So.2d 257, 260 (Fla. 3d DCA 1986) (holding that “the attorney-client privilege belongs to the client alone”). The client can voluntarily waive the privilege, and the privilege can be involuntarily waived by the presence of a third party. See Hoyas v. State, 456 So.2d 1225, 1228 (Fla. 3d DCA 1984) (finding that once the client offers testimony regarding the communication, the attorney-client privilege is waived). In the present case, Casey has not asserted the attorney-client privilege, and both Casey and Hirsch testified regarding the specifics of their communication. Further, a third party, Casey’s mother, was present during the communi *48 cations, and therefore, even if not voluntarily waived, the privilege was involuntarily waived. Additionally, under section 90.502(4)(a), if a client consults an attorney for advice which will aid in the commission of a crime or in the planning of future criminal activity, the attorney-client privilege does not exist. See also Horning-Keating v. State, 777 So.2d 438, 446 (Fla. 5th DCA 2001).
The second tape was recorded in Rappa-port’s office. Rappaport is a psychologist, Casey was his patient, and Casey was an invitee because he was asked to meet with Rappaport. Rappaport normally would enjoy a reasonable subjective expectation of privacy regarding communications he had with Casey in his office. However, when this conversation took place, Casey’s mother was present and, according to Casey, Rappaport was not acting in his role as a psychologist. Therefore, Rappaport’s subjective expectation of privacy was also greatly diminished, and because Rappa-port, Casey, and Casey’s mother all testified specifically about their communications, any privilege as to that particular communication was waived.

Step Two: Was the Expectation of Privacy One that Society is Prepared to Recognize as Reasonable?

Assuming that Hirsch and Rappaport were able to demonstrate that they possessed a subjective expectation of privacy, they must also show that their expectation was one the law was willing to recognize as reasonable. In determining whether a reasonable expectation of privacy exists to bring a communication within the purview of Chapter 934, Florida courts have looked to Title III of the Omnibus Crime Control Act of 1968, 18 U.S.C. § 2510, et seq., which Chapter 934 is patterned after, see Guilder v. State, 899 So.2d 412, 417 (Fla. 4th DCA 2005); State v. Tsavaris, 382 So.2d 56, 62 (Fla. 2d DCA 1980), and Fourth Amendment jurisprudence. See Stevenson v. State, 667 So.2d 410, 412 (Fla. 1st DCA 1996) (“The Florida Supreme Court has interpreted the test set forth [in the definition of “oral communication” under section 934.02(2) ] as substantially the same test used in a Fourth Amendment right to privacy analysis.”).
An “oral communication” protected under Chapter 934 is “any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation.” § 934.02(2), Fla. Stat. (2004) (emphasis added). The reasonableness of one’s expectation of privacy under a Fourth Amendment analysis rests on the totality of the circumstances, and, while location or “place” is an important consideration, it is not the sole consideration. As the United States Supreme Court recognized in Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Fourth Amendment protects people, not places.
[T]he parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls.... But this effort to decide whether or not a given ‘area,’ viewed in the abstract, is ‘constitutionally protected’ deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not subject of Fourth Amendment protection.
Katz, 389 U.S. at 351 (footnotes omitted).
The following cases identify some of the circumstances to be considered in determining whether an intercepted oral communication falls within the purview of Chapter 934. As these cases demonstrate, the circumstances to be considered in- *49 elude: (1) the location where the communication took place; (2) the manner in which the communication was made; (3) the nature of the communication; (4) the intent of the speaker asserting Chapter 934 protection at the time the communication was made; (5) the purpose of the communication; (6) the conduct of the speaker; (7) the number of people present; and (8) the contents of the communication.
State v. Inciarrano, 473 So.2d 1272 (Fla. 1985)
In Inciarrano, the Florida Supreme Court addressed whether a tape recording made by the victim murdered by Inciarra-no in the victim’s office fell within the statutory proscription of Chapter 934. Although the communication was taped without Inciarrano’s knowledge and consent, the Florida Supreme Court concluded that under the circumstances of that case, the communication did not fall within the purview of Chapter 934, and thus the tape was not subject to suppression. In reaching this determination, the Court looked to Inciarrano’s intent and conduct, and concluded that because he went to the victim’s office to commit a crime, Inciarrano’s expectation of privacy was not justified. Specifically, the Court stated:
Assuming he had a subjective expectation of privacy, we conclude that such expectation, under the circumstances, was not justified. Without a reasonable expectation of privacy, Inciarrano’s “oral communications” were not protected under section 934.03, and the trial court properly denied his motion to suppress. Inciarrano went to the victim’s office with the intent to do him harm. He did not go as a patient.
Id. at 1275.
Although Justices Ehrlich and Shaw disagreed with the Court’s focus on Inciarra-no’s conduct, rather than on the location where the communication took place, the majority opinion is the law in this state, and it has been relied on, as will be discussed herein, by both Florida and federal courts.
Jatar v. Lamaletto, 758 So.2d 1167 (Fla. 3d DCA 2000)
In Jatar, this Court, relying on Inciarrano, concluded that the intercepted communications between Lamaletto and his attorney, Jatar, which Lamaletto recorded without Jatar’s knowledge or consent, did not violate section 934.03. Lamaletto recorded his conversations with Jatar because he believed (correctly) that Jatar intended to extort money from him. This Court found that based on Jatar’s attempt to extort money from Lamaletto, Jatar had no legitimate or reasonable expectation of privacy and therefore, his oral communications were not protected under section 934.03. Specifically, this Court held that “[ajlthough Jatar undoubtedly had a subjective expectation of privacy, here, as the court concluded in Inciarrano, his expectation was not justified.” Jatar, 758 So.2d at 1169.
In reaching this conclusion, this Court considered Jatar’s conduct, Jatar’s intent, the contents of the taped communication, and the location where the communication was intercepted.
Jatar did not visit Lamaletto’s office in the ordinary course of business. As held in Inciarrano, Jatar went to Lamaletto’s office with the intent “to do him harm.” Id. at 1275. Society is not prepared to recognize as reasonable an expectation of privacy in such activity. See Id.
... Society is willing to recognize a reasonable expectation of privacy in conversations conducted in a private home. However, this recognition does not necessarily extend to conversations con *50 ducted in a business office. The reasonable expectation of privacy fails where, as here, the intent of the speaker does not justify such an expectation.
Jatar, 758 So.2d at 1169 (internal citations omitted).
Morningstar v. State, 428 So.2d 220 (Fla. 1982)
Although Inciarrano and Jatar involved situations where the wrong-doer intercepted oral communications in his own office without the consent of the other party, in Momingstar, the reverse situation occurred and the facts are more analogous to the instant case. Conversations between Momingstar and government informants were intercepted by law enforcement, who had placed phone monitors on Mornings-tar’s phones at his place of business, and also used “body bugs” on informants who met with Momingstar at his office. Although Chapter 934 was not implicated because section 934.03(2)(c) permits such interceptions by law enforcement when one party to the conversation consents, a Fourth Amendment analysis was performed because Florida’s Constitution prohibits warrantless interception of private communications notwithstanding section 934.03(2)(e). Thus, the Florida Supreme Court performed a Fourth Amendment analysis, which is the same analysis performed when determining whether a communication is an “oral communication” subject to Chapter 934. The Florida Supreme Court concluded that “[ajlthough Momingstar may have maintained a reasonable expectation of privacy in his private office, that expectation under these circumstances [(to commit a crime) ] is not one which society is willing to recognize as reasonable or which society is willing to protect.” Morningstar, 428 So.2d at 221.
Cohen Brothers, LLC v. ME Corp., S.A., 872 So.2d 321 (Fla. 3d DCA 2004)
In Cohen Brothers, two members of a management committee secretly recorded shareholder meetings conducted by telephonic conference calls. Relying on Jatar and Morningstar, this Court considered the location where the communications took place and the nature of the communications, and concluded that the intercepted communications were not protected under Florida’s wiretap statute. Cohen Brothers, 872 So.2d at 324-25. Specifically, we noted that “[sjociety does not recognize an absolute right of privacy in a party’s office or place of business,” id. at 324, and “we don’t believe that society would recognize, as reasonable, that such an expectation of privacy exists in a conference call, specifically where the call is held to conduct the business of the company.” Id. at 324-25. Department of Agriculture & Consumer Services v. Edwards, 654 So.2d 628 (Fla. 1st DCA 1995)
In this case, Officer Edwards was arrested and charged with violating section 934.03 after he secretly recorded communications he had with several of his supervisors in a supervisor’s office regarding a grievance he had filed. Additionally, Edwards’s employment was terminated by the Department of Agriculture and Consumer Services (“Department”) based on this conduct. Ultimately, the criminal charges against Officer Edwards were dismissed, and the Public Employees Relations Commission (“Commission”) directed the Department to reinstate Edwards. The First District affirmed the Commission’s order, stating as follows:
We conclude that the hearing officer was justified in finding that any subjective expectation of privacy held by Edwards’s supervisors was not reasonable under the circumstances of this case. We reach this conclusion based not on *51 the officers’ suspicion that Edwards would record their statements, but because of the number of persons present when the statements were made, the place chosen for the interview, and the very nature of that interview.
Id. at 632-38 (emphasis added).
Stevenson v. State, 667 So.2d 410 (Fla. 1st DCA 1996)
In Stevenson, law enforcement intercepted private conversations between occupants in a vehicle and three men outside the vehicle by the warrantless use of sensory devices without the consent of any of the parties. In determining that the intercepted communication did not constitute an “oral communication” within the meaning of Chapter 934, the First District found that, even if Stevenson possessed a subjective expectation of privacy regarding his conversation with the men outside of a van, his expectation of privacy was not one that society was prepared to recognize as reasonable under the circumstances. Id. at 412. This finding was based on the location where the communication occurred — in an open, public area; the manner in which the communication was made; and the nature of the communication— underscoring that “the circumstances surrounding the making of the statement were highly suggestive of criminal activity.” Id. at 412 (emphasis added). Migut v. Flynn, 131 Fed.Appx. 262 (11th Cir.2005)
In determining whether Migut, a tow truck operator who was stopped for a traffic violation, violated section 934.03 when he secretly recorded his conversation with the officer who stopped him, the United States Court of Appeals, Eleventh Circuit, applied Florida law. Specifically, the court relied on Inciarrano and Stevenson in concluding that the location where the conversation took place, the manner in which the communication was made, and the nature of the communication were all significant factors in determining the reasonableness of the officer’s expectation of privacy, id. at 265, and noted that “whether a particular communication is protected under § 934.03(1)(a) is an intensely fact-specific inquiry.” Id. at 267.
As the cited cases demonstrate, before determining whether the two recorded conversations at issue violated Chapter 934, the trial court was required to perform a two-part analysis. This analysis requires a finding that the non-consenting parties — Milton Hirsch and Dr. Michael Rappaport — “not only have [] a subjective expectation of privacy, but also [their] expectation under the circumstances must have been one that society is prepared to recognize as reasonable.” Inciarrano, 473 So.2d at 1275. Whether a particular communication is protected under Chapter 934 is an intensely fact-specific inquiry. Migut, 131 Fed.Appx. at 267. The trial court was, therefore, required to consider the circumstances under which the communications were made. This required an analysis of the location where the communication took place; the manner in which it was made; the nature, contents, and purpose of the communication; the intent of the speaker; and the conduct of the parties.

CASEY’S MOTION TO SET ASIDE HIS PLEA

Casey’s motion to set aside his plea was based on his claims that he was provided ineffective assistance of counsel by Hirsch who had a conflict of interest and coerced him to accept the State’s plea offer in order to protect Hirsch and Rappaport from their own illegal conduct. When Casey sought to use the tapes as substantive evidence at the evidentiary hearing, the trial court refused to listen to the tapes. *52 Consequently, the trial court failed to apply the requisite reasonable expectation of privacy two-step analysis, and, thus, did not consider the surrounding circumstances before denying Casey’s request and suppressing the evidence. This was error. Without listening to the tapes, it was impossible for the trial court to conduct the factually specific analysis mandated by binding Florida law prior to ruling on suppression of the tapes pursuant to Chapter 934.
The trial court also departed from established law when it denied Casey the ability to impeach Hirsch and Rappaport with the tapes. Even unlawfully obtained evidence is admissible for impeachment purposes. Although in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the Supreme Court of the United States held that the government cannot violate the Fourth Amendment and then use the fruits of its unlawful conduct to secure a conviction, the Court later clarified its position in Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), by holding that the defendant’s assertion on direct examination, that he had never possessed any narcotics, opened the door to attacking Weeks’ credibility by demonstrating that heroin had been unlawfully seized from him in connection with an earlier prosecution. Walder, 347 U.S. at 65. In reaching this conclusion, the Court explained:
It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government’s possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the Weeks doctrine would be a perversion of the Fourth Amendment.
[Tjhere is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government’s disability to challenge his credibility.
Walder, 347 U.S. at 65 (footnote omitted); see also Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (permitting the use in rebuttal of a confession previously suppressed pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); State v. Retherford, 270 So.2d 363 (Fla.1972) (following Harris and permitting a suppressed confession to be used as rebuttal evidence); Hawthorne v. State, 408 So.2d 801, 803 (Fla. 1st DCA 1982), abrogated on other grounds, Rogers v. State, 616 So.2d 1098, 1099-1100 (Fla. 1st DCA 1993) (recognizing that confessions obtained without warning the defendant of his right to counsel may be used to impeach the defendant’s credibility, even though the confession could not be used in the prosecution’s case-in-chief); Dornau v. State, 306 So.2d 167, 169 (Fla. 2d DCA 1974) (recognizing that the principles articulated in Walder apply in Florida, and that illegally seized evidence may be used either within the scope of proper cross-examination or in proper rebuttal to contradict the defendant’s direct testimony).
In Morales v. State, 513 So.2d 695 (Fla. 3d DCA 1987), this Court specifically addressed the admissibility of a recorded telephone conversation between the defendant and a co-defendant, Batista, who became a witness against the defendant at trial. Although the tape would have impeached Batista, the defendant’s trial counsel failed to challenge Batista with the recording, perhaps due to concern over the legality of a recording made by the defendant at counsel’s instruction. This Court, *53 finding ineffective assistance of counsel, reversed the defendant’s conviction and remanded for a new trial. Judge Daniel Pearson, in his concurring opinion, noted that in Inciarrano, the Florida Supreme Court held that a tape recording made by a murder victim without the defendant’s knowledge was admissible as substantive evidence because the defendant had neither a reasonable expectation of privacy nor one that society was prepared to recognize as reasonable. But even if the recording in Morales was not admissible as substantive evidence, it was admissible for impeachment purposes. Morales, 513 So.2d at 697 (Pearson, J., concurring); see also United States v. Simels, 654 F.3d 161, 169 (2d Cir.2011) (holding that recording of attorney advising his client, which was made in violation of federal law, may be used to impeach a witness, and noting that all federal circuits that have considered the issue have held that unlawfully obtained wiretap evidence may be used for impeachment in a criminal case”) (emphasis added).
Similarly, the Fifth District in Thompson v. State, 731 So.2d 819, 820-21 (Fla. 5th DCA 1999), the Fourth District in State v. Stout, 693 So.2d 657, 658-59 (Fla. 4th DCA 1997), and this Court in Franco v. State, 376 So.2d 1168 (Fla. 3d DCA 1979), have held that a recorded conversation is admissible under Chapter 934 where the purpose of the recording was to obtain an admission from the defendant that he was either part of a criminal act itself or to obtain an admission of a criminal act.
Thus, a review of the Rappaport and Hirsch tapes and a consideration of the relevant circumstances were required to determine if the tapes were admissible as substantive evidence. Additionally, if Rap-paport or Hirsch testified falsely about the conversations they had with Casey, the tape recording of that communication became admissible for impeachment purposes. Thus, the initial trial court erred in precluding Casey from introducing or using the tapes at the original evidentiary hearing on his motion to vacate his plea without considering the contents of the tapes and the other relevant circumstances.

CASEY’S MOTION FOR RELIEF OF JUDGMENT BASED ON FRAUD UPON THE COURT

After the initial trial judge denied Casey’s motion to vacate his plea, Casey filed a motion for relief of judgment on the basis that Hirsch, Rappaport, and the prosecutor had committed a fraud upon the court by knowingly presenting false testimony at the evidentiary hearing. In his motion, Casey alleged that Hirsch, Rappaport, and the prosecutor, who had all listened to the tapes just prior to the hearing, knew that Hirsch and Rappaport were providing perjured testimony and had intentionally misled the trial court. In response, the State immediately moved to seal the tapes and transcripts. The successor judge, who only listened to the Hirsch tape and failed to perform the correct analysis as to both tapes, granted the State’s motion to seal both tapes and other related court documents, and denied Casey’s motion.
The trial court clearly erred by (1) failing to listen to the Rappaport tape or to consider its contents; and (2) failing to consider the other relevant circumstances previously discussed in this dissent and the case law analyzed herein. Chapter 934 only protects oral communications made under circumstances that society is prepared to protect. Under Inciarrano, Jatar, Momingstar, and Stevenson, as Rappaport invited Casey to his office to encourage and assist Casey in committing *54 a crime, their intercepted communication is not an “oral communication” protected by Chapter 934.

SEALING THE TAPES AND COURT RECORD

After Casey filed his motion for relief of judgment based on fraud upon the court, but prior to the trial court’s ruling on the motion, the State filed a motion to seal the transcripts of the subject taped communications. In addition to granting the State’s motion, the trial court issued an order prohibiting Casey and “all in possession of the tape recording^] or a transcript of [their] contents” from using or disclosing the contents of these conversations. The trial court further ordered the sealing of Casey’s motion seeking relief of judgment based on fraud upon the court, Casey’s supplemental pleadings filed in opposition to the State’s motion to seal the transcripts, and the appendices to these pleadings. Thus, in his effort to obtain relief from the judgment entered against him, Casey was prohibited from using the very evidence he was relying on to prove his allegations of fraud on the court.
In addition to the issuance of its broad order restricting Casey’s use of the evidence he claims would prove his allegations of fraud upon the court, the trial court specifically omitted the sealed tapes, pleadings, and court records from its list of documents the Clerk of the Court was instructed to transport to this Court in the event Casey appealed. The record on appeal therefore did not include these items, and when Casey requested to supplement the record with the tapes and court records under seal to this Court, this Court denied the request and decided Casey’s appeal without considering the contents of the tapes.
Brugmann, as a member of the media, seeks review of the trial court’s order sealing from public view these two recorded communications and the sealed pleadings and court records filed by or in behalf of Casey. As a member of the public and the news media, Brugmann has standing to challenge the sealing of court records. See Barron v. Fla. Freedom Newspapers, Inc., 531 So.2d 113, 118 (Fla.1988).
A. Florida’s strong policy against secret proceedings and sealed judicial records
In Miami Herald Publishing Co. v. Lewis, 426 So.2d 1, 6 (Fla.1982), the Florida Supreme Court reiterated its longstanding support of open government and its application of this policy to the judicial branch. Specifically, the Court noted:
A trial is a public event, and there is no special perquisite of the judiciary which enables it to suppress, edit or censor events which transpire in proceedings before it, and those who see and hear what transpired may report it with impunity, subject to constitutional restraints mentioned herein.
Id. (quoting State ex rel. Miami Herald Publishing Co. v. McIntosh, 340 So.2d 904, 908-09 (Fla.1976)).
In weighing a defendant’s right to a fair trial with the press’ and the public’s right to access to the courts, the Florida Supreme Court noted the following:
Public access to the courts is an important part of the criminal justice system, as it promotes free discussion of governmental affairs by imparting a more complete understanding to the public of the judicial system. Such access gives the assurance that the proceedings were conducted fairly to all concerned. Aside from any beneficial consequences which flow from having open courts, the people have a right to know what occurs in the courts. The Supreme Court of the United States has noted repeatedly *55 that a trial is a public event. What transpires in the courtroom is public property. Public access also serves as a check on corrupt practices by exposing the judicial process to public scrutiny, and protects the rights of the accused to a fair trial. Finally, because participating lawyers, witnesses and judges know their conduct will be subject to public scrutiny, it is fair to conclude that they will be more conscientious in the performance of their roles.
Miami Herald, Publ'g Co., 426 So.2d at 6-7 (citations omitted) (emphasis added).
These important principles were codified ten years later in article I, section 24 of Florida’s Constitution. Article I, section 24, titled “Access to public records and meetings,” grants to the public “the right to inspect or copy any public record made or received in connection with the official business of any public body,” including the “judicial branches of government.” Art. I, § 24(a), Fla. Const. Subsection (c), however, authorizes the legislature to pass laws to exempt certain records from disclosure, providing the law “state[s] with specificity the public necessity justifying the exemption and shall be no broader than necessary to accomplish the stated purpose of the law.”
In recognition of the importance of openness in judicial proceedings and the public’s right of access to court records, the modern trend has decisively shifted from an era of secret files, mysterious case numbers, dockets shielded from public view, and sealed records, to greater transparency and rules prohibiting the sealing of court records unless expressly authorized by law. See In re Amendments to Fla. Rule of Judicial Admin. 2.120—Sealing of Court Records & Dockets, 954 So.2d 16-17 (Fla.2007) (holding that “[t]he Florida Constitution mandates that the public shall have access to court records, subject only to certain enumerated limitations”).
Because Florida strongly disfavors hiding court records from public scrutiny, In re Amendments to Fla. Rule of Judicial Admin. 2.120, 954 So.2d at 16-17, the party seeking closure, which in this case is the State, has a heavy burden to overcome. Barron, 531 So.2d at 118. As the Florida Supreme Court explained, “This heavy burden is placed on the party seeking closure not only because of the strong presumption of openness but also because those challenging the order will generally have little or no knowledge of the specific grounds requiring closure.” Barron, 531 So.2d at 118-19.
B. Suppress vs. sealing
In the instant case, the trial court’s order sealing the tapes, Casey’s pleadings, and other court records was a clear departure from established law and is contrary to Florida’s policy strongly disfavoring the hiding of court records from public view. Notably, Chapter 934 only prohibits the use of intercepted oral communications obtained in violation of this chapter — oral communications uttered by a person exhibiting an expectation of privacy under circumstances that society is willing to accept as reasonable. § 934.06, Fla. Stat. (2004). In furtherance of this objective, section 934.09(10)(a) provides that “[a]ny aggrieved person ... may move to suppress the contents of any intercepted ... communication, or evidence derived therefrom .... ” Thus, if after performing a proper analysis the trial court concluded that the intercepted communication(s) violated Chapter 934, the trial court could have suppressed the evidence. The trial court, however, failed to perform the requisite analysis, and rather than limiting its ruling to suppression of the evidence, it sealed the tapes, the transcripts of the *56 tapes, and various court records including Casey’s motion for relief of judgment and his supplemental pleadings and appendices.
Moreover, no “aggrieved party” moved to suppress the evidence. Neither Hirsch nor Rappaport moved to suppress the evidence. And instead of moving to suppress the evidence, the State moved to seal the evidence. Under Chapter 934, the State is not an aggrieved party.
In Alderman v. United States, 394 U.S. 165, 171-72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the United States Supreme Court analyzed Alderman’s standing to seek suppression of communications unlawfully intercepted in his co-defendant’s place of business. The Court underscored that “[t]he established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.” Id. at 171-72. The Court explained that because “Fourth Amendment rights are personal rights, ... [they] may not be vicariously asserted.” Id. at 174. Similarly, the Florida Second District Court of Appeal, relying on Aider-man, held that Albano, who was not a party to any intercepted communications or whose premises were not the site of such interception, lacked standing to challenge either the validity of the wiretap or the information derived therefrom. State v. Albano, 394 So.2d 1026, 1030 (Fla. 2d DCA 1981) (“[Alderman] held that suppression can only be obtained by those persons whose rights were violated by the search itself, which in a wiretap situation would be those persons whose conversations were intercepted or whose premises were the site of electronic surveillance.”). Consequently, the court found that Albano lacked standing to seek suppression of the evidence. Id.
Likewise, this Court in State v. Eber, 502 So.2d 32 (Fla. 3d DCA 1987), held that although Richard San Roman was arrested based on information obtained from an unlawful wiretap, because he was not a party to the unlawfully intercepted communication, San Roman was not an “aggrieved party” under section 934.02(9), and had “no standing to complain of infringements on the constitutional rights of others.” Id. at 33 (citing Alderman; Sarno v. State, 424 So.2d 829 (Fla. 3d DCA 1982); State v. Ferguson, 411 So.2d 963 (Fla. 3d DCA 1982)).
The suppression and sealing of the intercepted communications that are the subject of the instant petition were made at the request of the State, not by any of the parties to the communication. The State, however, is not an “aggrieved party” under Chapter 934 and, therefore, lacked standing to assert any objection to the evidence. Moreover, Chapter 934 only relates to the use of communications intercepted in violation of its provisions and does not govern sealing of records.
Additionally, the State’s motion to seal the intercepted communications should have been denied on due process and fundamental fairness grounds. It was the State, not Casey, who opened the door to the admission, use, and consideration of this evidence when it referred to the contents of the tapes when, as evidenced below, it questioned the witnesses and represented to the trial court what a review of the tapes would reveal at the evidentiary hearing on Casey’s motion to vacate his plea.

Cross-examination of Casey by the State:

State: What information Mr. Hirsch told you was he wished he would could [sic] make this disappear for you, not *57 you disappear, right Mr. Casey? This? [meaning the case].
Casey: I don’t know.
State: Well, you heard the tape didn’t you?
Casey: That was 2004, two years ago. State: And the tape says, I want this [to] disappear for you. That’s not you disappearing, is it, Mr. Casey?
Casey: I would have to listen to the tape.
State: And so you know that there is a tape made of that statement?
Casey: It’s coming from you.
State: I think it came from you.
Casey: You were speaking about the tape.
State: Several. You taped Dr. Rappa-port too, didn’t you?
Casey: I’m not going to — I plead the fifth on that.

Cross-examination of Casey’s mother by the State:

State: And [Hirsch] went over the evidence for approximately 25 to 35 minutes?
Mrs. Casey: I don’t remember it being that long going over the evidence.
State: Well, didn’t you tape the conversation?
Mrs. Casey: I refuse to answer on the grounds that it could incriminate me.
State: So you know there is a tape that exists of that conversation?
Mrs. Casey: I refuse to answer on the grounds that it could incriminate me.
State: And you know that tape shows that at no time did Mr. Hirsch say anything about I wish I can make Sean disappear; isn’t that correct?
Mrs. Casey: That’s what I heard him say.
State: He wanted this to disappear for Sean because he felt sorry for Sean, not for Sean to disappear?
Mrs. Casey: That’s not what I heard him say. I heard him say I wish I could put Sean on another planet somewhere and make him disappear. I took it to mean.
State: This to disappear.
Mrs. Casey: No. Make Sean disappear.

Direct-examination of Hirsch by the State:

State: Have you had the opportunity this morning to listen to a tape of your words?
Hirsch: Yes
State: And what is it that you were talking about in disappearing?
As the trial court recognized in its order sealing the evidence, there is a clear distinction between questioning a witness about what was said during the meetings with Hirsch and Rappaport, and referring to the contents of the tapes. Here, the State (1) referred to the contents of the tapes when questioning Casey and his mother; (2) represented to the initial trial judge what the tapes would show; (3) convinced the initial trial judge not to listen to the tapes based on the State’s representations; and (4) moved to seal the intercepted communications from public view and to preclude any consideration or use of the evidence at the hearing when Casey sought review of the tapes based on his claim that Hirsch, Rappaport, and the State had committed a fraud on the court.
C. The sealing of court records
Rule 2.420(a), Florida Rules of Judicial Administration, which governs the sealing of court proceedings and court records, provides that “[t]he public shall have access to all records of the judicial branch of government, except as provided below.” The various subsections of Rule 2.420 iden *58 tify the procedures that must be employed in determining the confidentiality of court records and the grounds that may be relied upon to deny the public’s access to court records. The trial court, however, did not proceed under or identify what provision of Rule 2.420 it was relying on in sealing the court records.
D. The trial court’s order
The trial court’s order sealing the recorded communications and other court records suffers from several additional fatal flaws. Most glaring is the order’s failure to provide any legal justification for the sealing of the Rappaport tape or any of the court records that refer to the contents of that tape. Although the trial court found that Hirsch had an expectation of privacy, it made no such finding as to Rappaport, nor did it identify any grounds for the sealing of the Rappaport tape.
Second, in its order sealing the tapes and court records, the trial court sidestepped its judicial responsibility to determine the legality of the intercepted communications by concluding that the predecessor judge had already determined that issue. A review of the record, however, reveals that the predecessor judge did not listen to either tape, consider any of the circumstances under which these communications were made, make any findings regarding whether Hirsch or Rappaport’s expectation of privacy was reasonable, or determine whether the interception of the communications violated Chapter 934. The predecessor judge merely suppressed the use of the tapes at the evidentiary hearing on Casey’s motion to set aside his plea based on a claim of ineffective assistance of counsel.
Third, the trial court’s order misstates the record. The order granting the State’s motion to seal states that both Casey and his mother testified that Hirsch had never directly told Casey to flee.[4] However, contrary to the trial court’s order, Casey and his mother both testified that Hirsch and Rappaport told Casey to flee the country. Rappaport made suggestions to Casey about how he could avoid being apprehended. Casey and his mother also testified that Rappaport told Casey he needed to follow his lawyer’s advice. Specifically, Casey testified as follows:
Q.: Now, did there come a time when Mr. Hirsch told you to leave the country or intimate that you should leave the country?
A: Yes, there was.
Q.: Tell the judge the first time that Hirsch suggested to you that you should leave the country and the circumstances.
A.: You know that if you are convicted of circumstantial evidence, and I have gotten to know you over these years, and you know, if I were you or if I could do anything. I would make you disappear. You speak Spanish, you travel a lot, you know prison is not going to be good for you. I certainly don’t want to *59 see you there and that could be where you could go, and basically that’s the message that I got quite clear from him.
Q.: All right. What did he specifically tell you, if you can quote it, that made you believe he wanted you to flee the country?
A.: In that particular meeting, it was, if I were you, I would just disappear.
Q.: Okay. Now, did you have subsequent meetings with Mr. Hirsch where the topic of you leaving the country was discussed?
A.: ... [I]t was the last week in November, he told me before I left, he said, go meet one more time with Dr. Rappaport.
When Casey did not schedule an appointment with Rappaport, Hirsch sent him a letter in December or January asking him to please see Rappaport. Casey scheduled a meeting with Rappaport and testified as to what occurred at that meeting:
A.: Dr. Rappaport said. You know, I know you met with Milton. You know, he gave you a message. Do you have any doubt? I just want to say that you know you can be a fugitive and he told me that it’s not difficult. He was telling me that there is fake I.D.’s. He even told me his two sons left the country one time and they look alike and they used different types of identification. He talked about plastic surgery. He talked about keeping a low profile. He mentioned all those things that were collaborating [sic] the information the advice that Mr. Hirsch gave me in his meeting.
A.: In that session, he said, well, I know you met with Milton. I’m here to, you know, convey the message.
Casey further explained that after his meetings with Hirsch and Rappaport, when he appeared for court hearings, Hirsch would make comments such as: “Oh, you’re still here?”; “I heard property is cheap in Argentina these days”; and “What’s the weather down there in South America?” When asked what occurred in Hirsch’s office on the day he recorded their conversation in May 2004, Casey testified:
A.: He said basically the same thing. He told me, not as direct, more indirectly, but he made the same comment.
Q.: What was the comment?
A.: I [Hirsch] wish he [Casey] would just disappear. If I [Hirsch] had a magic wand, I believe he [Hirsch] said, he [Casey] would disappear. And as they’re walking out of the office, he [Hirsch] had his arms around [my mother] saying just bring him [Casey] to Argentina.
Q.: He told your mom, bring him to Argentina?
A.: Yes. Send him or bring him. I don’t know the exact words.
Also contrary to the trial court’s order, Casey’s mother testified that when Casey told her his attorney was advising him to flee the country, she asked to meet with Hirsch. Casey’s mother further testified that during the subsequently scheduled meeting, Hirsch told them, “He wished he could put Sean in another planet and make him disappear....” At the end of the meeting, as they were walking out of Hirsch’s office, Hirsch told Casey’s mother, “[I]f I were you, I would make Sean disappear.” Casey’s mother also confirmed that Rappaport told Casey he should follow his lawyer’s advice and flee the country.
A.: And so when I met with Dr. Rappa-port, he was saying Sean should flee the country.
Q.: What did he say specifically?
*60 A.: Well, he specifically said that, you know, I think Sean should leave the country. It would be better for him. He said listen to your attorney. He said that several times, listen to your attorney.

CONCLUSION

Sealing the Rappaport tape and related documents

The order sealing the Rappaport tape, transcript of the Rappaport tape, and all of the court records that discuss the contents of this tape, was a departure from clearly established law. Although the communications between Rappaport, Casey, and Casey’s mother were taped without Rappa-port’s knowledge or consent they do not automatically invoke the protection of Chapter 934. Pursuant to Chapter 934 and binding decisional law, the trial court was required to make a finding that Rap-paport not only had a subjective expectation of privacy, but that his expectation was one which, under the circumstances, society is willing to protect. The trial court’s failure to make such a finding was a clear departure from established law.
Moreover, several factors undermine any protection of the tapes. The conversation captured on this tape took place in Rappaport’s business office, not in his home; see Jatar, 758 So.2d at 1169 (specifying that while “[s]ociety is willing to recognize a reasonable expectation of privacy in conversations in a private home ... [,] this recognition does not necessarily extend to conversations conducted in a business office”); Cohen Brothers, 872 So.2d at 324 (noting that “society does not recognize an absolute right of privacy in a party’s office or place of business”). It is undisputed that Rappaport invited Casey to his office, Rappaport knew Casey was going to bring his mother to the meeting, and the nature or purpose of the meeting was not to provide medical or mental health services or counseling to Casey. Edwards, 654 So.2d at 632-33 (holding that Officer Edwards’ supervisor had no reasonable expectation of privacy regarding statements recorded by Edwards in the supervisor’s office as other people were present when the statements were made, and because the nature of the communication was to interview Officer Edwards about the grievance he filed). Moreover, Casey alleges that the contents of this recorded conversation would establish that Rappaport counseled, aided, and abetted Casey to commit the felony crimes of (1) failure of a defendant on bond to appear, pursuant to section 843.15(1)(a), Florida Statutes; and (2) escape, pursuant to section 944.40, Florida Statutes.
As noted in Inciarrano, Jatar, Morningstar, and Stevenson, a tape recording made during the commission of a crime or where the communication is for the purpose of or in furtherance of the commission of a crime, it does not fall within the purview of Chapter 934. In Inciamno, the Court looked to Inciarrano’s intent and conduct and, held that because he went to the victim’s office to commit a crime, Inciarrano’s expectation of privacy was not justified. Inciairano, 473 So.2d at 1275. In Jatar, this Court also concluded that the recorded communication between Jatar (an attorney) and Lamaletto did not violate Chapter 934, because based on Jatar’s attempt to extort money from Lamaletto, Jatar had no reasonable expectation of privacy. Thus the recorded communication was admissible as evidence against Jatar. Likewise, in Momingstar, the Florida Supreme Court found that although Morningstar may have had an expectation of privacy in his private office, when the purpose of the communication was to commit a crime, his expectation of privacy was not one which society is will *61 ing to protect. Morningstar, 428 So.2d at 221. The First District also concluded in Stevenson that because “the circumstances surrounding the making of the statement were highly suggestive of criminal activity” and the parties had taken no action to ensure the privacy of their communication, Stevenson’s expectation of privacy was not one society was prepared to recognize as reasonable. Stevenson, 667 So.2d at 412 (emphasis added).
Thus, if the tape memorializing the communications between Casey, his mother, and Rappaport reflect that Rappaport counseled, aided, or abetted Casey to commit a felony, Rappaport enjoys no reasonable expectation of privacy and his oral communication is not protected under Chapter 934.
Further departing from well-established law, the trial court sealed the Rappaport tape without reviewing the tape or the transcript of the tape prepared by the State, or considering other relevant circumstances, such as Rappaport’s intent and conduct, and the presence of a third party (Casey’s mother) when the communications were intercepted. In doing so, the trial court failed to: (1) recognize that Rappaport does not enjoy an absolute right of privacy in his office; and (2) consider Rappaport’s intent and the nature of the communication by listening to the tape to determine whether Rappaport was counseling, aiding, or abetting Casey to commit a crime, thereby making Rappa-port himself a principal to the crime.

Sealing the Hirsch Tape and Related Documents

Although the trial court reviewed the Hirsch tape and concluded that this oral communication was protected by Chapter 934 because the recording “contains no direct or indirect evidence of criminal actions” by Hirsch, the Hirsch tape should not have been reviewed in a vacuum. The contents should have been reviewed in conjunction with the Rappaport tape and the testimony of the witnesses because what may have appeared to the trial court to have been an innocent comment by Hirsch may have taken on an entirely different meaning when viewed with the full record and the Rappaport tape.
Some of the evidence the successor judge failed to consider in evaluating whether to seal the Hirsch tape is: (1) whether the tape demonstrates that Hirsch gave perjured testimony at the evi-dentiary hearing; and (2) whether the tape, when considered with all of the other evidence, supports Casey’s testimony that Hirsch encouraged him to flee the court’s jurisdiction, thereby committing a fraud upon the court at the evidentiary hearing. The trial court should have considered, for example: (1) Hirsch’s insistence that Casey see Rappaport even though Casey had not seen Rappaport for quite some time; (2) that, when Casey did not schedule an appointment with Rappaport, Michael Haber, who was working with Hirsch, contacted Casey and told him to follow his attorney’s advice and to go see Rappaport; (3) whether the purpose and subject of the meeting with Rappaport was to convince Casey to flee; (4) that, although Hirsch had prior contact with Casey’s mother, Hirsch did not attempt to contact her when Casey failed to appear for court even though Hirsch told the judge he believed Casey “could be severely injured, hospitalized or perhaps dead”; and (5) that, after Casey failed to appear for court, instead of asking Casey’s mother if she had heard from Casey or if she had any idea where he was or why he failed to appear, Hirsch told her Casey would be fine.
A review of both tapes and consideration of all of the surrounding circumstances was required to determine whether Hirsch and Rappaport not only had a subjective expectation of privacy, but also an expectation of privacy that society is prepared to *62 accept as reasonable. If the tapes reveal that Hirsch and Rappaport were counseling Casey to commit a crime, the tapes were admissible as substantive evidence, and if they demonstrate that Hirsch and Rappaport gave false testimony at the evi-dentiary hearing, the tapes became admissible for impeachment purposes. Additionally, when ruling on Casey’s motion for relief of judgment, the trial court should have reviewed the tapes to determine if Hirsch and/or Rappaport counseled Casey to commit a crime; Hirsch and/or Rappa-port gave perjured testimony; and Hirsch, Rappaport, or the State committed a fraud upon the Court by falsely representing what was said on the tapes.
Lastly, even if the trial court suppressed or precluded the use of the intercepted communications based on a finding that the interception was a violation under Chapter 934, the Court was required30709175 to follow the procedures provided by Rule 2.420, Florida Rules of Judicial Administration, before sealing the tapes and other court records.
I, therefore, respectfully dissent from this Court’s denial of the instant petition and motion for rehearing en banc. Because the trial court’s order is in conflict with Article I, section 24 of the Florida Constitution, Rule 2.420, Florida Rules of Judicial Administration, and Florida case law; and because the sealing of these court records implicates Casey’s constitutional right to due process and the public’s right of access to the court, I submit the Florida Supreme Court has jurisdiction to review this case on conflict jurisdiction and as a case of exceptional importance.
SALTER and FERNANDEZ, JJ., concur.

. This opinion is not referring to attorney David Oscar Markus, who was not involved in the case.

. Because the tapes remain sealed, I am not permitted to comment on the veracity of the prosecutor’s representations or Hirsch’s testimony.

. See footnote one.

. The trial court’s order provides in part:
In this case, both the defendant and his mother had ample opportunity to testify that his attorney unlawfully told the defendant to flee to avoid prosecution. Instead, both testified that counsel never directly told him to flee nor provided any affirmative assistance before his flight.
The fact that both the defendant and his mother testified that counsel never directly told the defendant to flee nor provided any affirmative assistance before his flight, together with the fact that the defendant admits in a letter written to his counsel before the post-conviction evidentiary hearing that the recording "reveals very little" because Mrs. Casey was in the room, refutes the defendant’s claim that the recording contains direct evidence of criminal actions by the attorney.